UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

       v.

**AMENDED MEMORANDUM
AND ORDER**
21-CR-564 (WFK)

HAFIZULLAH EBADY,

          Defendant.
------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On October 22, 2024, Hafizullah Ebady[1] ("Defendant") pled guilty to one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, to wit, a violation of 18 U.S.C. § 1347. Plea Agreement (the "Plea") ¶ 1, ECF No. 389.[2] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to ninety-seven (97) months' incarceration; two (2) years of supervised release with both the standard and special conditions of supervision; mandatory restitution in accordance with the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the Order of Forfeiture, ECF No. 493; and a $100.00 mandatory special assessment.

## I.    Background

### A.  Factual Background

From April 2017 through March 2022, Defendant conspired with others "to execute a scheme and artifice to defraud one or more health care benefit programs[.]" Presentence Investigation Rep. (the "PSR") ¶ 1, ECF No. 411. To carry out the scheme, Defendant, Brian Michael Sutton, ("Sutton"), Brycen Kay Millett ("Millett"), Joshua Manuel Alegria ("Alegria"), Anthony Santamaria ("Santamaria"), Hershel Tsikman ("Tsikman," together with Defendant, Sutton, Millet, Alegria, and Santamaria, "Defendants"), Dela Saidazim ("Saidazim"),

---

[1] Defendant is also known as "Hafiz Ebady." Third Superseding Indictment (the "Indictment") at 1, ECF No. 241; Presentence Investigation Rep. (the "PSR") ¶ 10, ECF No. 411.

[2] Citations are to the docket in *United States v. Ebady, et al.*, 21-CR-564. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

1

and David Gary Bishoff ("Bishoff") "fraudulently bill[ed] private health care benefit programs (the 'Private Insurers') for fraudulent telemedicine prescriptions and . . . launder[ed] the proceeds of the scheme." *Id.* ¶ 13.

The scheme "involved over 50 pharmacies." *Id.* ¶ 12. "First, Bishoff and Millet used Call Centers" located in numerous locations around the globe—including the United States and Russia—to call "individuals enrolled in the Private Insurers . . . offer[ing] medications at no cost [and] without any medical exams to determine the medical necessity for those medications." *Id.* ¶ 13.

Second, Saidazim and others "recruited licensed physicians and generated fraudulent prescriptions for [the enrolled individuals] under the physicians' National Provider Identifier (NPI) codes" often "without their authorization." *Id.* ¶ 14. These fraudulent prescriptions would also be generated regardless of whether or not the enrolled individuals agreed to receive any medications. *See id.* ¶ 13.

Finally, Defendant "locate[d] . . . brick and mortar pharmacies . . . with pre-existing pharmacy board registrations and insurance relationships with the Private Insurers (the 'Scheme Pharmacies')" and "negotiate[d] [their] purchase . . . by straw buyers and direct[ed] their day-to-day operations." *Id.* ¶ 15. Through these efforts, Defendants, Saidazim, and Bishoff were able to "conceal the true ownership and control of the Scheme Pharmacies from the Private Insurers in order to delay discovery of the fraud and maximize their illicit gains before the Private Insurers stopped reimbursing the Scheme Pharmacies." *Id.* The scheme resulted in the scheme participants "own[ing], control[ling], and operat[ing], directly and indirectly, more than 50 Scheme Pharmacies across the United States[.]" *Id.* ¶ 16.

2

Defendant was specifically responsible for "visit[ing] the [Scheme Pharmacies], hir[ing], train[ing], supervis[ing] and fir[ing] employees, collect[ing] reimbursement payments sent by mail, communicat[ing] with landlords, forward[ing] bills and payroll information to Tsikman for payment, notif[ying] his co-conspirators of audits and terminations by Private Insurers, and clos[ing] the pharmacies." *Id.* ¶ 27. Overall, Defendant is estimated to have been "involved in the purchase and management of at least 30 Scheme Pharmacies." *Id.* For just seventeen of these pharmacies, "[t]hird-party billing records show . . . the scheme submitted more than $843 million in claims to Private Insurers and was paid over $195 million."[3] *Id.*

As a result of the scheme, Private Insurers lost hundreds of millions of dollars they paid in fraudulently obtained reimbursements prior to ending their business relationships with the Scheme Pharmacies. *See id.* ¶ 21. The money paid out by the Private Insurers was transferred offshore and concealed by Defendants, Saidazim, and Bishoff before the Private Insurers discovered the fraud. *See id.* Records from the remote billing software show that between April 2017 and March 2022, "[Defendants] and their co-conspirators caused the submission of over $1.7 billion in reimbursement requests to be submitted to Private Insurers and that the Private Insurers paid over $500 million as a result of the fraudulent submission." *Id.* ¶ 25.

**B. Procedural History**

On June 7, 2021, the United States filed a then-sealed complaint against Defendant and Saidazim, alleging their participation in the above-mentioned scheme. ECF No. 2. Shortly after the complaint was filed, "[D]efendant was arrested by Federal Bureau of Investigation (FBI)

---

[3] "The Government . . . cannot prove by a preponderance . . . [Defendant] 'purposely sought to inflict' the intended loss associated with these pharmacies[]" and therefore the Government utilizes "the actual loss . . . for purposes of calculating the [G]uidelines." PSR ¶ 27.

agents on June 9, 2021." PSR ¶ 27.  A similar complaint was filed against Bishoff and Millet on March 7, 2022.  ECF No. 1.

On November 8, 2021, a U.S. Grand Jury returned a two-count indictment against Defendant and Saidazim.  ECF No. 29.  On August 5, 2022, a U.S. Grand Jury returned a two-count superseding indictment (the "First Superseding Indictment") against Defendant, Saidazim, Bishoff, and Millet.  ECF No. 92.  On February 16, 2023, Saidazim waived indictment and the Government filed a single-count superseding information against her.  ECF Nos. 154, 155.

On November 3, 2023, a U.S. Grand Jury returned a three-count third superseding indictment against Defendants (the "Indictment").  *See generally* Indictment, ECF No. 241.  The Indictment charged Defendants with the following: Count One alleged conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349; Count Two alleged health care fraud in violation of 18 U.S.C. § 1347; and Count Three alleged conspiracy to money launder in violation of 18 U.S.C. § 1956(h).  *See id.* ¶¶ 26–31.  The Indictment also raised criminal forfeiture allegations pertaining to all Counts.  *See id.* ¶¶ 32–35.

On October 22, 2024, Defendant pled guilty to Count One of the Indictment.  *See* Plea ¶ 1; *see also* Indictment ¶¶ 26–27.  Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of 120 months' incarceration or below.  *See* Plea ¶ 4.  The Government further agreed "[n]o further criminal charges [would] be brought against [Defendant] for his participation in criminal activity involving healthcare fraud, related money laundering and conspiring to commit the same as alleged in the [Indictment], all from the period April 2017 through March 2022[.]" *Id.* ¶ 5(a).  Additionally, the Government agreed to dismiss the remaining counts of the Indictment and any underling indictments with prejudice as to Defendant at the time of sentencing.  *See id.*

In paragraph two of the Plea, the parties also stipulated to moving "for an additional one-point reduction" at the sentencing hearing (the "Global Disposition") "if [Defendant] and certain of his co-defendants all pl[ed] guilty on or before September 18, 2024[.]" Plea ¶ 2. In paragraph sixteen of the Plea, where this reduction is "discussed in more detail[,]" the date "September 18" is mutually cross out and "October 22" is written in pen as a replacement, alongside three initials in the margin. Plea ¶¶ 2, 16. The Government reserved its right to "elect not to recommend [this] reduction under the Guidelines for a global disposition." Plea ¶ 16. However, on May 6, 2026, the Government filed a letter requesting the Court depart from the applicable Guidelines sentence and sentence Defendant as if his Total Adjusted Offense Level were one point lower, in accordance with the Global Disposition. *See* Gov't Sent'g Mem. Supp. at 1, ECF No. 498.

In the Plea, the parties further agreed "to the entry of a forfeiture money judgment in the amount of . . . $1,820,770.34" consistent with 21 U.S.C. §§ 853(p) and 982(b)(1) (the "Forfeiture Money Judgment"). Plea ¶¶ 6–13. On October 24, 2024, the Government filed a motion for the Court to enter a preliminary Order of Forfeiture, ECF No. 390, where Defendant agreed to pay the Forfeiture Money Judgment in full thirty days in advance of sentencing, or otherwise "forfeit any other property of his up to the value of the outstanding balance[.]" Ord. of Forfeiture ¶ 3, ECF No. 493 (citing 21 U.S.C. §§ 853(p) and 982(b)(1)). The Court granted this motion the same day. The Government reports Defendant has made no payment toward this amount. *See* Gov't Sent'g Mem. at 8, ECF No. 491.

On February 16, 2023, Saidazim pled guilty to the sole count of the superseding information pursuant to a written plea agreement, charging her with conspiracy to commit health care fraud in violation of 18 U.S.C. § 371. *See* Saidaizim Plea Agreement ¶ 1, ECF No. 153. On

5

December 13, 2023, she was sentenced to time served and restitution in the amount of $88,000.00. *See* Saidazim Mem. and Ord., ECF No. 315.

On March 31, 2023, Bishoff pled guilty to Count One of the First Superseding Indictment, charging him with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. There is no sentencing hearing scheduled for Bishoff at this time.

On February 26, 2024, Millett pled guilty to Counts One and Three of the Indictment. There is no sentencing hearing scheduled for Millett at this time.

On June 13, 2024, Alegria pled guilty to Counts One and Three of the Indictment pursuant to a written plea agreement. *See* Alegria Plea Agreement ¶ 1, ECF No. 358. There is no sentencing hearing scheduled for Alegria at this time.

On September 27, 2024, Tsikman pled guilty to Count One of the Indictment pursuant to a written plea agreement. *See* Tsikman Plea Agreement ¶ 1, ECF No. 374. On May 4, 2026, he was sentenced to 120 months' incarceration to be followed by two years of supervised release with both standard and special conditions of supervision, and mandatory restitution. *See* Tsikman Mem. and Ord., ECF No. 494.

On September 30, 2024, Santamaria pled guilty to Count One of the Indictment pursuant to a written plea agreement. *See* Santamaria Plea Agreement ¶ 1, ECF No. 375. He is scheduled to be sentenced on May 19, 2026. *See* Scheduling Ord., ECF No. 471.

There has been no additional action in the case against Sutton since his arrest.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the U.S. Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . .

initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

## III. Analysis

### C. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

7

### 1.    Family and Personal Background

Defendant was born on April 28, 1978, in Kabul, Afghanistan, to the marital union of his father, Assadullah Ebady, and his mother, Sharafgul Ebady (née Aquily). PSR ¶ 59. Before immigrating to the United States in 1980, Assadullah "worked as a physician and served in a high-ranking position in the military[]" in Afghanistan. *Id.* ¶¶ 59, 61. "[A]t some point during [Defendant]'s early childhood years[]" Assadullah moved to Pakistan "due to concerns that he would be targeted by members of the Russian military." *Id.* ¶ 61. While in Pakistan, Defendant's father "worked as a physician at a refugee camp . . . providing care to others who sought refuge from the war in Afghanistan." *Id.* Approximately a year later, Assadullah sent for his family—including Defendant—to join him in Pakistan, where "they stayed . . . for approximately six months before they were accepted as refugees into the United States." *Id.*

Defendant and his family settled in Pennsylvania following their immigration to the United States, and "he became a naturalized United States citizen on August 13, 2008." Second Add. to PSR at 1, ECF No. 441 (amending PSR ¶ 62). Initially, Defendant reports feeling unwelcomed in the neighborhood until "their neighbors came to understand that his family was hardworking." PSR ¶ 61. "[His] parents received public assistance benefits . . . and his siblings worked minimum wage jobs to contribute to the household income and expenses" throughout his childhood. *Id.*; *see infra* Section III(A)(2). Nevertheless, Defendant reports "[his] basic living needs were always met[,]" and he recalls "no history of abuse of any kind." PSR ¶ 61. Defendant relocated to New Jersey in 2012, where he remained until his arrest in the instant case. *See* Second Add. to PSR at 1.

Defendant's father passed away in December 2017 "due to complications from a history of kidney problems." *Id.* ¶ 59. Defendant maintains a close relationship with his mother, who is

8

eighty years of age and resides in Effort, Pennsylvania, as a homemaker. *See id.* She suffers from chronic health conditions and "requires the assistance of a walking cane after undergoing two knee replacements." *Id.* "[D]ue to his concern for her physical health[,]" "[Defendant] has not told her about the instant case[.]" *Id.*

Defendant has eight siblings with whom "[he] shares close relationships . . . [and] all of whom are aware of his conviction in the instant case and remain supportive of him." *Id.* ¶ 60. All Defendant's siblings reside in Pennsylvania. *Id.*

On March 9, 2012, Defendant married Madina Ebady (née Shoaid). *See id.* ¶ 63. Madina resides with Defendant in Parsippany, New Jersey, where she "works as a substitute teacher as needed." *Id.* "She reported their family has had financial trouble because of the instant case, as [Defendant] has not been able to obtain stable employment," but "[Defendant] has borrowed money from his family to help financially support their household." *Id.* ¶ 64. Defendant reports Madina "has been experiencing symptoms of depression and post-traumatic stress since [his] arrest . . . [after] agents entered the family's home with guns drawn . . ." *Id.* ¶ 63.

The couple share two children: Abbas Ebady, age thirteen, and Zahira Ebady, age eleven. *Id.*; Def.'s Sent'g Mem., Ex.A, ECF No. 479, The children reside with the couple, "attend school, and are in good health." PSR ¶ 63. Defendant reports "[Madina] finds it difficult to be fully engaged with their children because of her depression, so [he] often cares for the children and the home." *Id.* Medina stated Defendant is someone "who does everything for their family." *Id.* ¶ 64 (internal quotation marks omitted). Defendant's children are not aware of his conviction in the instant case. *Id.* ¶ 63.

In addition to the above, the Court has considered Defendant's own letter and the letters of support his friends and family have submitted on his behalf. *See generally* Def.'s Sent'g Mem., Exs. A–B; Def.'s Sent'g Mem. Supp., Ex. A, ECF No. 497.

> 2. *Educational and Employment History*

Defendant received a high school degree from the honors program at John Bartram High School in Philadelphia, Pennsylvania, in 1991. *See* PSR ¶ 71. Following his graduation, Defendant attended the Community College of Philadelphia from 1991 to 1993. *See id.* ¶ 72. He ultimately obtained a bachelor's degree from Temple University in 1999. *See id.*

From 1999 to 2003 or 2004, Defendant continued his education "as a pharmacy student[]" at the University of Sciences in Philadelphia, Pennsylvania. *Id.* "[He] ultimately obtained a master's degree in pharmaceutical business after deciding not to complete his [fifth] year of studies." *Id.*

Defendant's first record of employment was "as a pharmacy technician for Rite Aid for six months in 2001." *Id.* ¶ 78. From 2001 to 2009, Defendant "work[ed] in a family-owned flower shop with his siblings[.]" *Id.* Income from these employment opportunities was not reported. *See id.*

From 2005 to 2011, Defendant was "the owner and manager of PhilaRx Pharmacy." *Id.* ¶ 77. Defendant reported earning $6,000.00 in monthly gross profits. *See id.* "He sold the business to Rite Aid[] after he was unable to open a second pharmacy location for this business[.]" *Id.*

From 2011 to 2012, Defendant was "the co-owner and manager of Safe Drugs Pharmacy[.]" *Id.* ¶ 76. Defendant reported earning $4,000.00 in monthly gross profits. *See id.* He sold this business because "it was not as successful as he had hoped." *Id.*

From 2012 to 2015, Defendant "attempted to start his own franchise model to open pharmacies under t[he] business name [Healthi Cure], but was ultimately unsuccessful." *Id.* ¶ 75. During this time period, Defendant also reports "attempt[ing] to purchase a daycare center[]" with his wife, "but the seller decided to back out of the deal." *Id.* Prior to backing out, Defendant and his wife paid the seller, who subsequently failed to return "most of" the money. *Id.*

Defendant's last record of employment prior to his arrest was as "the president and manager of Open a Pharmacy, LLC," one of the businesses which was "engaged in the instant offense." *Id.* ¶ 74. Defendant reported earning $8,000.00 in monthly gross profits from 2015 until the business closed in 2021. *See id.*

Defendant has been unemployed since 2021. *Id.* ¶ 73. Defendant reports "he is financially supported by his wife or through financial assistance they sometimes receive from other family members." *Id.*

### 3. *Prior Convictions*

Defendant does not have any prior juvenile adjudications or adult criminal convictions. *See id.* ¶¶ 52–57.

### 4. *Physical and Mental Health*

In September 2017, "[Defendant] was diagnosed with Stage 3 squamous cell carcinoma," which "quickly spread to his lymph nodes and his throat[.]" *Id.* ¶ 67. Defendant underwent "a surgical procedure on October 5, 2017," in connection with the condition and "underwent six weeks of radiation treatment[]" in November 2017. *Id.* As a result of the radiation treatment, Defendant suffered "significant hair loss, . . . severe headaches and migraines." *Id.* Defendant

11

also contracted radiation fibrosis, causing him "limited mobility in his neck[.]" *Id.* Defendant also reports he "experiences severe facial and neck swelling . . ." and xerostomia. *See id.*

Moreover, Defendant identifies "severe damage to his rotator cuff in both arms," "a torn anterior cruciate ligament (ACL) in his right knee, a torn meniscus in both knees, Stage 3 arthritis in his right knee, and Stage 2 arthritis in his left knee." *Id.* ¶ 68. Lastly, Defendant states he has "a cataract in his left eye[]" and "[h]is hearing in his left ear has dramatically worsened over the past years." *Id.*

Otherwise, Defendant states he has "no history of mental or emotional health conditions and no history of gambling problems." *Id.* ¶ 69. However, he is "experiencing radiation-induced cognitive decline[]" as a result of his cancer treatment, "making it almost impossible to form new memories and recall basic daily tasks." *Id.* ¶ 67.

In addition to the above, the Court has considered the medical records provided by Defendant's oncologist and orthopedist. *See* Def.'s Sent'g Mem., Ex. C.

   5. *Substance Abuse*

Defendant reports having "no history of alcohol or drug use and no history of treatment for substance abuse." PSR ¶ 70.

   6. *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

**D. The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. "Fraud schemes like the one perpetrated in this case threaten the integrity of the American health care system." Gov't Sent'g Mem. at 9. Defendant "knowingly took active steps to further the scheme." *Id.* at 7. "While [Defendant] was not a founder or leader of the conspiracy, he was an eager participant who, when he suspected and was warned of the illegality of the scheme, doubled-down out of greed." *Id.* at 8.

The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

### E. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3). Defendant pled guilty to one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. *See* Plea ¶ 1.

Defendant faces a maximum term of ten years' incarceration and no minimum term. 18 U.S.C. § 1347. Defendant also faces a maximum term of three years of supervised release. 18 U.S.C. §§ 3583(b)(2), 3559(a)(4). If a condition of release is violated, Defendant may be sentenced to up to two years of incarceration without credit for pre-release imprisonment or time previously served on post-release supervision. 18 U.S.C. § 3583(e). Defendant is eligible for a term of probation of one to five years. 18 U.S.C. § 3561(c)(1). Unless extraordinary

circumstances exist, the Court must impose one of the following as a condition of probation: a fine, restitution, or period of community service.  18 U.S.C. § 3563(a)(2).

### F.  The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  18 U.S.C. § 3553(a)(4)(A).

The Government and Defendant stipulated to a Total Adjusted Offense Level of 30 in the Plea.[4]  *See* Plea ¶¶ 2, 16.

The applicable provision of the Guidelines is § 2X1.1, which directs the Court to apply the "base offense level for the substantive offense."  U.S.S.G. § 2X1.1(a).  Here, the Base Offense Level for the substantive offense—health care fraud—is found in U.S.S.G. § 2B1.1, which covers, *inter alia*, forms of theft.  U.S.S.G. § 2B1.1.  Under U.S.S.G. § 2B1.1(a)(2), Defendant has a Base Offense Level of 6.  *Id.*; PSR ¶ 40; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 13; Plea ¶ 2.

The parties agree certain adjustments should apply to Defendant.  First, the parties agree U.S.S.G. § 2B1.1(b)(1)(N) adds 26 levels because the total loss stemming from Defendant's involvement in the offense—based on the Government's estimates and the Plea—was greater than $150,000,000.00, but less than $250,000,000.00.  U.S.S.G. § 2B1.1(b)(1)(N); PSR ¶ 41; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 13; Plea ¶ 2.

---

[4] The parties initially calculated a Subtotal Adjusted Offense Level of 34.  *See* Plea ¶ 2.  The Total Adjusted Offense Level the parties stipulated to is 30 because the Subtotal Adjusted Offense Level was subject to a two-level reduction if "[D]efendant] clearly demonstrated acceptance of responsibility," a one-level reduction if "[he] and certain co-defendants all plead[] guilty on or before September 18, 2024," and a final one-level reduction if "[he] plead[] guilty on or before [October 22, 2024]."  *See id.* ¶¶ 2, 16.

Second, the parties agree U.S.S.G. § 2B1.1(b)(2)(A)(i) adds 2 levels because the offense involved ten or more victims.  U.S.S.G. § 2B1.1(b)(2)(A)(i); PSR ¶ 42; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 13; Plea ¶ 2.

Finally, the parties agree U.S.S.G. § 2B1.1(b)(10)(B) adds 2 levels because a substantial part of the fraudulent scheme was committed from outside the United States and involved sophisticated means.  U.S.S.G. §§ 2B1.1(b)(10)(B), (b)(10)(C); PSR ¶ 43; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 13; Plea ¶ 2.

The parties have varying opinions on whether certain mitigating factors should apply to Defendant pursuant to the Guidelines.  First, the parties agree a three-level reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b).  U.S.S.G. §§ 3E1.1(a)–(b); PSR ¶¶ 48–49; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 13; Plea ¶ 2.

Second, the parties agree a two-level reduction should apply because Defendant is a Zero-Point Offender under U.S.S.G. § 4C1.1(a).  U.S.S.G. § 4C1.1(a); PSR ¶ 50; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 13; Plea ¶ 2.

Finally, Probation and Defendant agree a one-level reduction should apply due to the Global Disposition, i.e., because Defendant, Santamaria, and Tsikman all pled guilty on or before October 22, 2024, as contemplated in paragraphs two and sixteen of the Plea.  Plea ¶¶ 2, 16 (striking the date September 18, 2024); Prob. Sent'g Recommendation ("Prob. Sent'g Rec.") at 3, ECF No. 411–1; Def.'s Sent'g Mem. at 13; Gov't Sent'g Mem. Supp. at 1.  Probation and

Defendant include the Global Disposition as part of their Guidelines calculations.[5]  Prob. Sent'g Rec. at 3; Def.'s Sent'g Mem. at 13.

The Government does not apply this one-level reduction to its calculation because the Guidelines "no longer include departure provisions for, among other things, global resolution." Gov't Sent'g Mem. Supp. at 1.  Although the Government maintains the accuracy of its Guidelines calculation without the reduction, it requests the Court apply the Global Disposition at the time of sentencing given the condition was met.  *See id.*

The parties agree Defendant's Criminal History Category is I because he does not have any prior juvenile adjudications or adult criminal convictions.  PSR ¶ 54; Gov't Sent'g Mem. at 5; Def.'s Sent'g Mem. at 13; Plea ¶ 2.

Because the parties disagree whether an applicable mitigating factor applies pursuant to the Guidelines, their calculations of the applicable Guidelines range differ.  Probation and Defendant calculated a Total Adjusted Offense Level of 30 which, combined with a Criminal History Category of I, results in a Guidelines range of ninety-seven (97) to one hundred and twenty-one (121) months' incarceration pursuant to the Sentencing Guidelines Table.  U.S.S.G. § 5(A); Prob. Sent'g Rec. at 3; Def.'s Sent'g Mem. at 13.  The Government calculated a Total Adjusted Offense Level of 31 which, combined with a Criminal History Category of I, results in a Guidelines range of 108 to 135 months' incarceration.  U.S.S.G. § 5(A); Gov't Sent'g Mem. at 5.  Both Guidelines ranges are subject to a ten-year statutory maximum under 18 U.S.C. § 1347. Plea ¶ 1(a).

---

[5] Probation asserts U.S.S.G. § 5K2.0 is the statute for which the Government agreed to reduce Defendant's Guidelines sentence by 1 level if he entered a guilty plea by the agreed upon date.  *See* Prob. Sent'g Rec. at 3; *see also* Plea ¶¶ 2, 16.  However, neither the Plea nor the Government's sentencing memorandum and supplement mention U.S.S.G. § 5K2.0.  *See generally* Plea; Gov't Sent'g Mem.; Gov't Sent'g Mem. Supp.

This Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

## G. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

The parties have not drawn the Court's attention to any applicable policy statements. Finding none on its own, the Court proceeds to the next § 3553(a) factor.

## H. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

Because one of his co-defendants "received a sentence of time served," Defendant argues "a sentence of time served for [Defendant] is therefore appropriate to avoid unwarranted sentencing disparities." Def.'s Sent'g Mem. at 25. Defendant asserts the Court should find him and Saidazim similarly situated, or he less culpable, because in his view: (1) they "both served functions critical to the operation of the conspiracy, but both had limited decision-making power[]"; and (2) "[Saidazim] made the conscious choice to engage in the conspiracy knowing that her conduct was entirely and utterly criminal, whereas [Defendant] did not." *Id.* at 26–29. The Court recently sentenced another of his co-defendants to 120 months' incarceration to be followed by two years of supervised release. *See* Tsikman Mem. and Ord.

The Government disagrees. As a preliminary matter, the Government notes "the Court must fashion a sentence that avoids unwarranted sentencing disparities among similarly situated defendants nationwide, not merely with respect to two co-defendants." Gov't Sent'g Mem. at 10

17

(citing *United States v. Stewart*, No. 23-CR-6330, 2024 WL 3517853, at \*2 (2d Cir. Jul. 24, 2024)). Even so, the Government distinguishes Defendant from Saidazim, noting they "are not similarly situated." *Id.* at 11. Defendant and Saidazim differ primarily in the (1) significance of their roles and responsibilities and (2) their levels of compensation within the conspiracy. *See id.* at 11–12. In short, the Government states "[w]here Saidazim was a voice on the phone or the woman sending the WhatsApp messages, [Defendant] was the man-on-the-ground," as demonstrated by Defendant's significantly larger share of the criminal proceeds. *Id.* at 11.

The Court has reviewed and considered carefully the parties' arguments. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

## I. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to the Plea, Defendant agreed to a Restitution Order "in the full amount of $195,601,140.03, to be paid in accordance with the restitution order to be filed under seal with the Court in connection with the plea." Plea ¶ 1(e); *see also* 18 U.S.C. §§ 3663A and 3664. Probation reports "the Government has not provided [it] with a detailed list identifying each victim, their contact information, and their associated losses[]" and therefore "Affidavits of Loss could not be forwarded to the victims." PSR ¶ 26.

The Government has also not yet provided any victim-related information required to determine the amount of restitution. *See generally* Gov't Sent'g Mem. Additionally, Defendant now argues in favor of "a hybrid restitution order, pursuant to which [Defendant]'s restitution

18

would be capped at $1,820,770.34, which reflects his role in the criminal conspiracy." Def.'s Sent'g Mem. at 40.

As of the time of sentencing, no other responses have been received regarding victim losses. The Court reserves its right, pursuant to 18 U.S.C. § 3664(d)(5), to hold an evidentiary hearing within ninety days of sentencing to determine the specific amounts owed to Defendant's victims. The Court will issue a Final Order of Restitution accordingly.

## IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to ninety-seven (97) months' incarceration; two (2) years of supervised release with both the standard and special conditions of supervision; restitution as set forth in the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the Order of Forfeiture, issued on October 24, 2024; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: May 8, 2026
       Brooklyn, New York